# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 20-695V
Filed: August 7, 2025

\* \* \* \* \* \* \* \* \* \* \* \* \*   \*
ROBERT WILLIS, *as father and natural*   \*
*guardian of* A.W., *as a minor,*   \*
                                      \*
              Petitioner,             \*
                                      \*
v.                                    \*
                                      \*
SECRETARY OF HEALTH                   \*
AND HUMAN SERVICES,                   \*
                                      \*
              Respondent.             \*
\* \* \* \* \* \* \* \* \* \* \* \* \*   \*

*Braden Blumenstiel, Esq.,* The Law Office of DuPont & Blumenstiel, Dublin, OH, for petitioner.
*Katherine Esposito, Esq.,* U.S. Dept. of Justice, Washington, DC, for respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

On June 9, 2020, Robert Willis ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] ("Vaccine Act" or "Program"), on behalf of his daughter, A.W. Petitioner alleged that A.W. experienced "small ticks, leg swelling, hives behind the knees, swollen face, fever, and breathing problems" as a result of the Pentacel and Prevnar vaccines she received on June 9, 2017. Petition, ECF No. 1. The matter was dismissed for insufficient proof on August 28, 2023. ECF No. 62.

Petitioner now seeks an award of attorneys' fees and costs, requesting a total of **$46,355.02**, representing $43,325.61 in attorneys' fees and $3,029.41 in costs. Motion for Fees, ECF No. 65.

After careful consideration, petitioner's Motion for Attorneys' Fees and Costs is **GRANTED, in part** for the reasons set forth below.

---

[1] This Decision will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet.** As provided in 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. To do so, each party may, within 14 days, request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, this Decision will be available to the public in its present form. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

# I.    Procedural History

The petition was filed on June 9, 2020 along with medical records. Petitioner's Exhibits ("Pet. Ex.") 1-5, ECF No. 1. Petitioner filed additional medical records on September 27, 2020; December 30, 2020; and May 25, 2021. Pet. Ex. 6, ECF No. 8; Pet. Ex. 8-18, ECF No. 12; Pet. Ex. 19, ECF No. 18. Petitioner filed three motions for extension of time to file these medical records over the course of ten months. ECF Nos. 7, 11, 17. He filed a statement of completion on June 21, 2021. ECF No. 19.

The case was reassigned to the undersigned on July 7, 2021. ECF No. 21. Respondent filed a status report on September 27, 2021, identifying outstanding medical records, which petitioner was subsequently ordered to file. ECF Nos. 24-25. Petitioner filed untimely motions for extension of time on November 29, 2021, and February 1, 2022, both of which were granted.[3] ECF Nos. 26-29. Petitioner then filed a timely motion for extension of time on March 31, 2022, which was also granted. ECF Nos. 30-31. Petitioner filed the outstanding medical records on May 6, 2022.[4] Pet. Ex. 20-22, ECF No. 38.

On July 18, 2022, respondent filed his Rule 4(c) Report, recommending against compensation. ECF No. 40. Respondent provided a detailed review of A.W.'s medical records, noting that petitioner had not established by a preponderance of the evidence that A.W. had at least one medically recognizable diagnosis. *Id.* at 21-22. Further, respondent noted numerous medical records that remained outstanding. *Id.* at 3-5, 7. Petitioner was ordered to file the records by September 16, 2022. ECF No. 41. Petitioner failed to comply with this deadline.

On September 19, 2022, petitioner was ordered to file a motion for extension of time that included an explanation for his failure to comply with court orders by the close of business that day. He was reminded that failure to comply with court orders may result in dismissal of the claim and will result in reduction of counsel's fees. ECF No. 42. Petitioner failed to comply with this order.

An Order to Show Cause was issued on September 20, 2022, directing petitioner to file the outstanding medical records, a motion for extension of time, or otherwise show cause as to why the case should not be dismissed for failure to comply with court orders. ECF No. 43. Petitioner was advised that failure to respond to the order or any other orders would result in the immediate dismissal of the claim. *Id.*

On September 27, 2022, petitioner filed a motion for extension of time to file the outstanding medical records. ECF No. 44. He also filed a status report detailing the status of the records requested. ECF No. 45. Respondent filed a response the following day, objecting to petitioner's motion for extension and noting that petitioner's counsel has asked for numerous

---

[3] Petitioner's counsel was routinely reminded of the necessity of complying with all Court-ordered deadlines. ECF Nos. 27, 29.

[4] Petitioner originally filed these records on April 19, 2022; May 3, 2022; and May 4, 2022. ECF Nos. 32-33, 36. However, petitioner did not properly label and identify the exhibits in accordance with the Guidelines for Practice Under the National Vaccine Injury Compensation Program, and the filings were stricken by the Court sua sponte after petitioner was advised of the issues and failed to correct the filings. ECF No. 37. The exhibits were filed properly on May 6, 2022. ECF No. 38.

extensions already, some of which were filed out of time, and that none of the extension requested were made after consulting respondent. ECF No. 46.

An order was issued on September 29, 2022, detailing the procedural history of this matter, petitioner's many requests for extensions of time totaling 330 days to secure and file necessary medical records, and counsel's routine failure to comply with court orders. He was informed that his attorneys' fees would be appropriately reduced at the conclusion of the case to reflect this continued conduct. Petitioner's motion was ultimately granted, though he was advised that no further extensions would be granted. ECF No. 47.

Petitioner filed medical records and a status report detailing the status of the records he was ordered to file on December 12, 2022. Pet. Ex. 23-28, ECF Nos. 48-49. Petitioner filed the remaining outstanding records and a statement of completion on January 10, 2023. Pet. Ex. 29, ECF Nos. 50-51. On February 24, 2023, respondent filed a status report confirming the record was complete and reiterating the position expressed in his Rule 4(c) Report. ECF No. 52.

A status conference was held on April 7, 2023. At the beginning of the conference, petitioner's counsel was asked if he was prepared to discuss the medical records, affidavits, and allegations associated with this case. He advised that he was not prepared to do so because he believed the purpose of the conference was to discuss how the case should move forward. ECF No. 53. Despite counsel being unprepared to discuss a case that was almost three years old at the time, I summarized A.W.'s medical history and highlighted various issues with the case, including that the petition alleged symptoms rather than a definable injury or diagnosis. I noted that the petition alleged that A.W. suffered from small ticks, leg swelling, hives behind the knees, and a swollen face, none of which were contained in any medical record filed or reported by A.W.'s parents at any medical visit following her vaccinations. *Id*. at 2. Because these alleged "symptoms" were not reported or found on examination, the six-month severity requirement as set forth in the Vaccine Act could not be satisfied. *Id*.; § 11(c)(1)(D)(i).

Further, while A.W. had seen numerous specialists and undergone extensive testing, all testing was negative with no regression and normal development noted. ECF No. 53 at 3. A.W. was noted to have mild hypotonia diagnosed by a neurologist, but her treating physicians could not/would not correlate this condition to her vaccinations when specifically asked to do so by her parents. Other than physical therapy for mild hypotonia and ferritin and iron supplementation for sleep myoclonus, A.W. did not receive any treatment for any definable disease or injury. *Id*. When counsel was asked what injury he was alleging was caused by A.W.'s vaccinations, he advised that he intended to hire an expert to support a specific injury. He was advised that no expenditure should be made on retaining an expert in this case based on the contemporaneous medical records filed. He was reminded that it was his responsibility to review the medical records and determine if there was support for a vaccine-related injury before filing a petition. *Id*. Petitioner's counsel was then ordered to review all the medical records filed in this case and discuss the case with his client. *Id*.

On May 12, 2023, petitioner filed a status report claiming that review of the medical records demonstrated that some of A.W.'s treating physicians opined that the vaccines she received "were or could be causal factors to the symptoms A.W. has been experiencing." ECF No. 54.

Petitioner advised of his intent to seek support in the form of written opinions from the treating physicians, and depending on the responses received, would determine how or if to proceed. *Id.*

An order was issued on May 15, 2023, repeating the summary of the medical records presented during the status conference and addressing petitioner's recent status report. ECF No. 55. Petitioner's counsel was provided specific parameters for the treating physicians' potential reports, including that they must cite to the medical records in support of their opinion, rather than the facts as alleged by petitioner. It was further noted that only reports from A.W.'s treating physicians should be filed, and any costs expended on any hired experts at this time was at petitioner's counsel's own risk and may not be reimbursed by the Program. *Id.*

On June 29, 2023, petitioner filed a status report advising that the treating physicians he contacted to provide medical opinion letters in support of his claim were unwilling or unable to provide the requested letter for various reasons. Petitioner's counsel stated that he spoke to his client about this, and petitioner was considering how or if to proceed with his claim. ECF No. 56.

An order was issued on June 30, 2023, repeating the summary of the medical records and discussing the progress of the case since that time. ECF No. 57. Petitioner's most recent status report was also addressed, and petitioner's counsel was again reminded that the medical records filed in this matter do not justify any expenditure of money on expert reports, and any costs incurred on experts would be at his own risk and may not be reimbursed. *Id.* at 3. Finally, it was reiterated that there is no definable vaccine-related injury alleged or contained in the records, and petitioner was to file for dismissal of his claim. *Id.* at 4.

On July 13, 2023, petitioner's counsel sent an ex parte communication to the Court via email, advising that petitioner and his wife did not want to dismiss the claims because "they were previously told by medical providers that the vaccines were a cause of their daughter's health problems." Court Ex. 1, ECF No. 60. Counsel further explained:

> I appreciate and understand Special Master Roth's view of this case, and I don't want to pursue cases that have no legitimate chance to result in compensation for my clients. However, I would like an opportunity to have a retained expert review the case. I am aware Special Master Roth has stated costs for an expert may not be reimbursed, and I have informed my clients that any money advanced to an expert may not be reimbursed. Nonetheless, they would like to have a retained expert look over the case. I have already conferred with someone who is willing to review the claim. I believe the review can be completed in a couple of weeks or so. I have advised my client that if we have a retained expert review the case and he/she cannot support the claim, I would advise them to dismiss the case.

*Id.* Petitioner's counsel's email was filed as Court Exhibit 1, and my law clerk replied to the email, copying respondent's counsel and advising petitioner's counsel that he should file a formal motion.

Petitioner filed a formal motion for extension of time on July 14, 2023. ECF No. 58. He argued that the records demonstrate several treating physicians believed the vaccines A.W. received on June 9, 2017 may have been a cause of her health issues, and he provided citations to

the record to support this assertion. *Id.* at 1-2. Petitioner stated that although those treating physicians declined to provide opinions in this case, counsel has identified and contacted a qualified expert who is willing to review the claim. Petitioner was aware that any costs associated with an expert may not be reimbursed and acknowledged the Court's position on this claim, stating that he will advise petitioner to dismiss the claim if an expert is unable to opine that the vaccines played a role in A.W.'s health problems. *Id.* at 3-4. Respondent did not file a formal response to petitioner's Motion, but petitioner indicated in his Motion that he discussed the requested extension with respondent's counsel, who "takes no position on the request and defers to the Court." *Id.* at 5.

On July 17, 2023, petitioner also filed affidavits from himself and A.W.'s mother. The content of the affidavits was largely the same and repeated their desire to pursue having an expert review the case, their awareness that the expenses associated with such expert may not be reimbursed by the Program, and their intent to dismiss the case should the expert prove unable to support the claim. Pet. Ex. 30, Pet. Ex. 31; ECF No. 59.

An order was issued on July 18, 2023, addressing petitioner's motion. ECF No. 60. The procedural history of the matter was reviewed in detail, and it was noted that several prior orders were issued regarding the deficiencies in the case, including the details of the contemporaneous medical records; the inconsistencies between the facts as alleged by petitioner and the medical records; the failure of the petition to allege any specific injury only a string of symptoms unsupported by the medical records; and the absence of any diagnosis attributed to any vaccines A.W. received. *Id.* at 1-3. It was also highlighted that the recently filed affidavits from A.W.'s parents still failed to provide any specific injury or diagnosis. *Id.* at 3. Petitioner was granted a thirty-day extension to either file a report from a qualified expert based on the requirements set forth in the order, or to file for dismissal of the petition. *Id.* at 4.

On August 28, 2023, petitioner filed an untimely motion to dismiss, and a decision was issued dismissing the petition for insufficient proof on the same date. ECF Nos. 61-62.

On April 4, 2024, petitioner filed a Motion for Attorneys' Fees and Costs, requesting a total of **$46,355.02**, representing $43,325.61 in attorneys' fees and $3,029.41 in costs.[5] Motion for Fees, ECF No. 65. On April 2, 2024, respondent filed a response raising reasonable basis and deferring to the special master as to whether the statutory requirements for an award of attorneys' fees and costs were met. Response, ECF No. 66. Petitioner did not reply.

This matter is now ripe for adjudication.

## II.    Factual Background

### A.  Summary of Relevant Medical Records

---

[5] The total amounts represented by petitioner in his Motion are not the same as those reflected in the billing records and receipts provided as Exhibit 2 of his Motion for Fees. Accordingly, the totals discussed herein are those that are supported by the documentation petitioner has provided. *See* Motion for Fees, Ex. 2.

A.W. was born on February 6, 2017, weighing 6 pounds, 11 ounces. The pregnancy was complicated by gestational diabetes, but her nursery course was unremarkable. Pet. Ex. 3 at 3.

On February 17, 2017, at 11 days old, A.W. was presented to her pediatrician, Dr. Moore, by her parents for concerns of twitching and abnormal movements during sleep; her mother filmed one to two second movements of her foot and hand intermittently while she slept and brought the video to the pediatrician. There was no diagnosis made, and Dr. Moore wrote that the concern was a "[f]eared complaint," offered reassurance, and discussed possible causes and presentations of neonatal seizures. Pet. Ex. 3 at 4.

At A.W.'s two-month visit on April 7, 2017, Dr. Moore noted that A.W. was taken to the emergency department ("ED") for an upper respiratory infection with no fever and multiple episodes of reflux 30 minutes after eating. Her parents reported that she spit up and arched her back when lying flat or sitting up after feeds. Pet. Ex. 3 at 8. She received Pentacel and Prevnar vaccines in the left thigh, and a rotavirus vaccine by mouth. *Id*. at 1.

A month later, on May 5, 2017, A.W. was brought back to Dr. Moore. Her father reported concern that A.W. had difficulty holding her arm in proper position, and her mother reported that A.W. held her arm in an extended position and fisted her hands. Her mother googled brachial plexus injury and was afraid A.W. suffered an injury. Examination was normal, and no diagnosis was made. Pet. Ex. 3 at 9.

A.W. was next presented to the pediatrician on June 9, 2017 for a four-month well checkup. She was noted to have some dry skin, but the examination was otherwise normal with an assessment of reflux. She was prescribed Zantac. She received the subject Pentacel and Prevnar vaccines. Pet. Ex. 3 at 11-12. Later that day, A.W. was taken to the ED with a fever of 100.2 reportedly after vaccinations. Pet. Ex. 24 at 414. Her mother reported "grunting," perceived labored breathing, and that it appeared that A.W. held her breath. *Id*. Examination revealed clear lungs, no retractions or flaring, she was well-hydrated, sucking her pacifier well with no cellulitis or petechial rash. There were no meningeal signs, and the fontanel was soft. *Id*. A chest x-ray was clear. *Id*. at 435. The final impression was viral infection and infant acne. *Id.* at 414. The record documented A.W. as active, well-appearing, non-toxic, attentive, interactive, and appropriate for her age with no evidence of lethargy or irritability. *Id*. at 416.

The next medical visit or communication with medical personnel was six weeks later, on July 21, 2017, when A.W. was presented for concerns of abnormal arm movements, shallow breathing, and reaction to vaccines. Pet. Ex. 3 at 13. Her mother reported that A.W. had a high fever of 101 degrees six to eight hours after receiving her four-month vaccines with abnormal arm movements and was seen in the ED. Her mother claimed she stopped babbling and smiling after the vaccines but started babbling and interacting normally three to four weeks later, and the same thing happened after her two-month vaccinations. Pet. Ex. 3 at 13. The record documented "abnormal involuntary movement" and "serum reaction due to vaccination", a referral to a neurologist, and to refrain from immunizations until the neurological evaluation was completed. *Id*.

On September 1, 2017, A.W. was evaluated by Dr. Susan Klein, a pediatric neurologist,

for reported "abnormal involuntary movements". Pet. Ex. 8 at 6-18. Dr. Klein reviewed the videos provided by A.W.'s parents and the history they provided as follows:

> Since she was born, [A.W.] would have twitches of her arms and legs, with videos shown to PCP who felt she would grow out of it. (video as a younger baby) At the 2 month shot, she screamed for 5 days, her stomach bothered her, she had a fever. The parents thought it was a rotavirus vaccine reaction. At the 4 month shot, and ~3-4 hrs after the shot, she had a fever. She went to sleep. She was making grunting noises like she could not breathe she was screaming when she woke up (second video). Her leg had knots and redness around the injection site. She was seen in Aultman ER. Within a few days, she went nonverbal for 4 weeks (had been repeating hiyee, o-you), and she would not pay attention to you (would stare off and would not look at mother). Mother used Himalayan pink salts in the bath X 5 times and her skills came back. She moves her head from side to side in the night, leg twitching and shallow breathing when she is asleep.

*Id*. at 13. Dr. Klein noted "increased tone of legs, possibly some head lag, and unstable sitting" on examination. *Id*. at 15. She ordered an EEG to evaluate the leg shaking and recommended physical therapy to help her reach motor milestones. Dr. Klein assessed A.W. with abnormal increased muscle tone, episode of shaking, and gross motor development delay, noting:

> It is difficult to say whether the events parents are describing are related to vaccines. Many neurological disorders have their origin in the first 12 months of life, so we generally focus on trying to figure out whether they are present. To this end, I will recommend some screening (fasting or illness) metabolic testing, EEG as mentioned above, and, depending upon how she does over the next few months with PT and what the testing shows, MR brain imaging (I am not ordering this now). I am in favor of continuing immunization, so, although it is reasonable to wait until a few things are clarified, I would strongly recommend that she continue to get these, because they do prevent serious neurological disease. I don't know why she is breathing shallowly and whether this is related to the other concerns or not. It is also not clear whether there are birth issues (i.e., placental changes) that might be contributing to her presentation (see below).

Pet. Ex. 8 at 15-16.

On September 15, 2017, A.W. underwent a 20-hour EEG reviewed by Dr. Chinasa Nwankwo, a pediatric epileptologist. Pet. Ex. 8 at 25-27. Her mother reported A.W. has had episodes of twitching of the extremities during sleep since birth. The EEG was normal, with no seizures recorded and no clear epileptiform discharges seen. "Multiple events of concern" were captured, but they were not epileptic in origin and appeared to be benign sleep myoclonus. *Id*. On September 16, 2017, A.W. underwent extensive testing, including a complete blood count ("CBC"), comprehensive metabolic panel, manual differential after scan, organic acids, and urine. Pet. Ex. 5 at 14-18.

On October 2, 2017, Dr. Klein returned a call from A.W.'s mother and informed her that

the EEG was normal, CBC showed macrocytic anemia, and the amino acid profile showed elevated alanine with normal ammonia, so additional labs were needed. The mother said A.W. had attended two weeks of PT. Pet. Ex. 8 at 73-74.

A.W. saw Dr. Klein for follow-up on October 26, 2017. Pet. Ex. 8 at 76-85. The examination was remarkable only for leg dragging, but Dr. Klein noted "at this point, that would almost fall within normal limits, and her neurological exam and neurological testing, with the exception of the elevated alanine, is essentially normal. She has had no regression." *Id*. at 85. Dr. Klein referred her to a sleep clinic, recommended continued PT, and ordered repeat bloodwork. *Id*.

On December 1, 2017, A.W. saw Dr. Chughtai for her nine-month appointment. Pet. Ex. 3 at 15-16. She was assessed as a well child with vaccines on hold "due to maternal concern and will wait until evaluated by neurology." *Id*.

On December 27, 2017, A.W. was seen by Dr. Jyoti Krishna at the Akron Children's Hospital sleep clinic for sleep-related breathing problems and unusual movements in sleep. Her parents reported these symptoms since birth. Pet. Ex. 8 at 125-26. Dr. Krishna wrote that the mother's description of the breathing pauses appeared benign, but a sleep study was suggested along with continued PT. He also discussed bed safety and the hazards of co-sleeping. *Id*. at 129.

A.W. returned to Dr. Klein for follow-up on January 29, 2018. She was doing well, with no events of concern since her last visit. Pet. Ex. 8 at 164-67. The examination was normal, except she was "slightly hypotonic, diffusely." Dr. Klein wrote:

> Her parents are asking whether her birth process and tightening of umbilical cord around her neck at delivery could have caused this (I don't know), why she had the elevation in amino acids (also don't know) and whether she should start catching up on vaccines (yes). I am really pleased with her exam at this point; she has mild hypotonia but has typical development. The jerking in sleep is being worked up by the Sleep Center, and I will be interested to see what they find.

*Id*. at 166.

A.W. was reevaluated at PT on February 8, 2018. She had been attending PT weekly since September 2017. The record noted that she was initially referred to physical therapy "following a bad reaction to 4 month vaccinations." Pet. Ex. 9 at 201. Her mother advised that she had started walking but seemed off balance, like she was putting more weight on her right leg than left. She was noted to be improving with therapy and achieving her goals. Pet. Ex. 9 at 201-04.

A.W. underwent sleep study on March 6, 2018 at Akron Children's Hospital. She was observed to have "clinically insignificant sleep apnea" and periodic limb movements of ten per hour that "may or may not be clinically meaningful" in a patient so young, as less than five movements per hour is normal. Pet. Ex. 9 at 232-33.

On March 19, 2018, A.W. had her one-year well visit with Dr. Chughtai. She was doing

well. Her parents wanted to hold off on immunizations. The recent neurology evaluation and sleep study were documented. Pet. Ex. 3 at 17. She started iron supplementation. Pet. Ex. 9 at 253.

Petitioner saw Dr. Vargo on June 5, 2018 with a three-day history of diarrhea thought to be either food borne or viral. Pet. Ex. 9 at 324, 329. Her problem list on that day was updated to include "Vaccine reaction – 4 months." Pet. Ex. 8 at 98. There were no concerns reported at her 15 month old check up with Dr. Vargo on June 21, 2018. She was noted to be "[d]evelopmentally improving. Continuing to work with PT for gross motor delay" and growing well. Pet. Ex. 9 at 363. Dr. Vargo noted that A.W. was behind on vaccines and her mother was uninterested in further vaccination. She documented a "[r]eaction to 4 month vaccinations with change in muscle tone and abnormal movements." *Id*. Under the "Screenings" heading, Dr. Vargo noted "Previous Vaccine Reactions: Yes." *Id*. at 365.

On July 30, 2018, A.W. saw Dr. Klein for follow-up. The diagnoses included hypotonia, sleep-related movement disorder, and leg length discrepancy. Pet. Ex. 9 at 392. Dr. Klein noted that A.W. had not had any motor regression and was meeting her milestones, though she has "marked hypotonia." Pet. Ex. 10 at 202-03. Dr. Klein ordered a brain MRI and a muscle enzyme test with possible referral to physiatry depending on the testing results. *Id*.

A.W. saw Dr. Dennis Weiner on August 1, 2018 for an orthopedic evaluation of leg length discrepancy and back and leg pain. Pet. Ex. 10 at 223. Her gait was normal, and she had "no signs of any significant leg-length discrepancy" or other orthopedic abnormality. *Id*.

At her 18-month check up on August 7, 2018 with Dr. Vargo, her parents reported continued tics and twitches. They refused vaccinations. Pet. Ex. 10 at 246. A new heart murmur was noted, and she was referred to a cardiologist. *Id*.

A.W. saw Dr. Stephen Manu, a cardiologist, on August 21, 2018. An ECG demonstrated "normal biventricular systolic function with no evidence of cardiomyopathy." Pet. Ex. 10 at 284. The impression was a "Still's murmur (a benign heart sound)" and hypotonia. *Id*.

On November 14, 2018, A.W. was taken to the ED by ambulance for seizure-like symptoms lasting one minute. Her temperature in the ED was 103.4 degrees and she was given Tylenol. Pet. Ex. 11 at 670. She was seen the next day for follow-up of febrile seizure. Testing was negative for Strep A and respiratory virus. Pet. Ex. 11 at 616, 631.

At her December 12, 2018 visit, Dr. Klein thought A.W. had a "possible genetic disorder" based on her gross motor delay, hypotonia, pathological right handedness, possible mild language disorder, sleep related movement disorder, low iron, leg length discrepancy with scoliosis, febrile seizure, and benign sleep myoclonus. Pet. Ex. 11 at 672. She believed the issues to be likely related and recommended genetic testing. Dr. Klein noted, "I have no opinion about the relationship of these issues to vaccine injury, and the parents are aware of this, as I am of their decisions, which they are pursuing thoughtfully." *Id*.

A.W. saw physiatrist Dr. Micah Baird on January 22, 2019. He noted that "[s]he has had low tone since 4 months of age when she had routine vaccinations. Mom associates the problems

with the vaccination." Pet. Ex. 11 at 789. She was assessed with mild developmental delays, a gait abnormality, and a diagnostic genetics evaluation was recommended. *Id*. at 794.

On February 4, 2019, the cytogenomic microarray analysis genetic testing was normal results. Pet. Ex. 12 at 823.

On April 22, 2019, A.W. was examined by Dr. Deborah Rukin Gold, a pediatric neurologist whose impression was a "2 year old girl with history of hypotonia but no evidence to suggest neuromuscular disease and no history to suggest cerebral palsy. Given her normal developmental trajectory over the past 18 months, hard to implicate vaccines as causative for her early motor delay." No further testing was recommended. Pet. Ex. 20 at 4.

In the months that followed, A.W. continued with physical therapy. *See* Pet. Ex. 12. She was evaluated by occupational therapy ("OT"), and it was determined that she was progressing appropriately developmentally and did not need OT, though she was "a little behind with fine motor skills." Pet. Ex. 21 at 921; Pet. Ex. 13 at 118. She also continued to follow with Dr. Klein, who recommended seeing a geneticist. Pet. Ex. 13 at 1059, 1115.

A.W. and her family saw Dr. Catherine Melver via telehealth on April 6, 2020 for an evaluation for genetic syndrome. Pet. Ex. 14 at 1294. Her history was noted, and the impression was a three-year-old with delays in motor skills with twitching and hypotonia. Dr. Melver recommended whole exome sequencing since the microarray testing ruled out a chromosomal disorder. *Id*. at 1297.

When A.W. saw Dr. Klein on May 18, 2020, she documented the treating history and noted that "[n]o unitary diagnosis has emerged as of yet." Pet. Ex. 4 at 2. She was noted as having benign sleep myoclonus and behavioral issues. *Id*. at 3.

On June 16, 2020, A.W.'s parents met with Kimberly Wallis, a genetics counselor. Pet. Ex. 14 at 1387. Swabs were taken for genetic testing the following week, and testing was conducted for mitochondrial disorders/sequence analysis and deletion testing of the mitochondrial genome. Pet. Ex. 21 at 1. The results showed "[n]o pathogenic variant known to be associated with a disorder of mitochondrial metabolism was identified by this analysis of the entire mitochondrial genome in this patient." *Id.*

A.W. was seen by a developmental pediatrician for her behavioral issues and was diagnosed with anxiety and disruptive behavior. Pet. Ex. 15 at 1460-73. She continued PT and began OT in August 2020. *See* Pet. Ex. 15. In September 2020, she was diagnosed with hyperopia of both eyes with astigmatism after an eye exam. Pet. Ex. 16 at 1602, 1609.

## B. Affidavit of Petitioner, Robert Willis

Petitioner filed an affidavit with his petition, affirming that A.W. "was in good health and had no significant medical issues" prior to receiving the Pentacel and Prevnar vaccines on June 9, 2017. Pet. Ex. 1 at 1. He affirmed that within one day of receiving the vaccines, A.W. experienced

small ticks, leg swelling, hives behind the knees, swollen face, fever, and breathing problems which she did not have prior to the vaccinations. *Id.*

According to petitioner, during the night following A.W.'s vaccinations, she was taken to the emergency room "with complaints stemming from A.W.'s adverse reaction to the vaccines." Pet. Ex. 1 at 2. A.W. saw several medical providers, underwent multiple diagnostic tests, and received medical treatment for her symptoms. *Id.* "On or about July 2017, Dr. Laurise Moore of Akron Children's hospital informed me she believed A.W.'s medical problems were due to the vaccines she received on June 9, 2017." *Id.* Petitioner affirmed that A.W. continues to experience hypotonia in her muscles, tremors in her limbs prior to sleeping, sleep problems, focus problems and behavioral problems, and receives medical treatment to control her symptoms. *Id.*

Petitioner filed a second affidavit in July 2023, in support of his motion for extension of time to have an expert review the case and provide a report. Pet. Ex. 30. The content of this affidavit was largely the same as petitioner's first affidavit repeating that one of A.W.'s treating physicians believed A.W.'s medical problems were due to the vaccines she received on June 9, 2017. *Id.* at 1. He added that A.W. was diagnosed with hypotonia, a "vaccine reaction" and has received physical and occupational therapy for years following the vaccines, which she never required prior to receiving the vaccines. *Id.* Petitioner affirmed that A.W.'s health problems have had a "significant impact" on the entire family, and he feels obligated to try to determine the cause. *Id.* at 2. He acknowledged that he would have to dismiss the case if an expert finds the vaccine played no causal role in A.W.'s health problems. *Id.* at 3.

### C.  Affidavit of A.W.'s Mother, Tiffany Demmel

A.W.'s mother, Tiffany Demmel, also filed an affidavit in July 2023, in support of petitioner's motion for extension of time so that an expert could review the case and issue a report. Pet. Ex. 31. Ms. Demmel's affidavit contained much of the same information as petitioner's, including that A.W. had no significant medical issues prior to receipt of the Pentacel and Prevnar vaccines on June 9, 2017, "began to experience a wide variety of health problems" after the vaccinations and was diagnosed with hypotonia and a "vaccine reaction". *Id.* Ms. Demmel stated that she stopped working to help take care of A.W. full-time due to the health problems she experienced, and A.W.'s medical issues "created a financial hardship" for the family and physical and emotional difficulties for A.W. *Id.*

Ms. Demmel affirmed that "[s]ince A.W. was diagnosed as having suffered a vaccine reaction, it has been (and continues to be) my belief that the June 9, 2017 vaccines caused (or significantly contributed to) A.W.'s health problems." Pet. Ex. 31 at 1. Ms. Demmel acknowledged that she and her husband would dismiss the case if the retained expert could not provide support for the claim. *Id.* at 2.

### III.    Parties' Arguments

### A.  Petitioner's Motion

In his motion for attorneys' fees and costs, petitioner discussed the law on good faith and reasonable basis. Motion for Fees at 1-6, ECF No. 65. He pointed out that respondent did not question good faith because petitioners are entitled to a presumption of good faith and good faith was established in this case. *Id.* at 6.

Petitioner argued that his claim had a reasonable basis at filing and throughout the pendency of the claim. Motion for Fees at 6. Petitioner and his wife's affidavits affirmed that A.W. began to experience "adverse reaction symptoms" within 24 hours of receiving the vaccinations on June 9, 2017 and that A.W. had never experienced those symptoms until after she received the vaccinations. Further, they affirmed that they were informed by A.W.'s treating physicians that she experienced an adverse reaction to the vaccines. *Id.* at 10; Pet. Ex. 1; Pet. Ex. 30; Pet. Ex. 31.

The motion papers included a listing of medical record references counsel argued supported a connection between vaccinations and A.W.'s health problems providing a reasonable basis for the claim, including: the June 10, 2017 emergency room record documenting "possible allergic reaction"[6]; Dr. Moore's July 21, 2017 record documenting "reaction to vaccines," diagnoses of "abnormal involuntary movement" and "serum reaction due to vaccination"[7]; Dr. Vargo's November 30, 2017, record documenting that A.W. had experienced a "'vaccine reaction'"[8]; Dr. Klein's July 30, 2018, record which documented that A.W. "had a vaccine reaction, gross motor delay and should have an alternate vaccine schedule"[9]; Dr. Vargo's problem list on August 7, 2018 including "vaccine reaction" and that A.W. was on an alternate vaccine schedule[10]; Dr. Manu's record for August 21, 2018, which documented "determined A.W. had a reaction to her 4 month vaccines"[11]; "vaccine reaction" documented on December 5, 2018[12]; and a February 12, 2019, record which documented "continued to assess her as having an 'adverse effect of vaccine, subsequent encounter'".[13] Motion for Fees at 10.

Petitioner argued that the medical records reflected that "numerous treating physicians believed A.W. suffered an adverse reaction to the June 9, 2017 vaccines." Motion for Fees at 11. Further, petitioner affirmed that "Dr. Moore personally informed him A.W.'s health problems were due to the Jun (sic) 9, 2017 vaccines." *Id.* Petitioner explained that he attempted to obtain supporting medical opinion letters from Dr. Moore and Dr. Vargo, but both doctors declined to participate. He therefore attempted to obtain a supporting medical opinion from a retained expert, but the expert determined that he "likely could not definitively prove the June 9, 2017 vaccines caused A.W.'s medical problems." *Id.* Once he was unable to obtain support from these sources, he voluntarily asked this Court to dismiss his petition. *Id.*

Petitioner concluded that the evidence demonstrates a reasonable basis for filing and pursuing the claim until the treating physicians and retained expert determined they "could not definitively prove the vaccines caused A.W.'s symptoms." Motion for Fees at 12. Once he could

---

[6] Pet. Ex. 28 at 9.
[7] Pet. Ex. 3 at 13.
[8] Pet. Ex. 8 at 98.
[9] Pet. Ex. 9 at 392.
[10] Pet. Ex. 10 at 240.
[11] *Id.* at 82.
[12] Pet. Ex. 11 at 40.
[13] Pet. Ex. 12 at 43.

not get supporting evidence from an expert, he asked the Court to dismiss his petition. Thus, the claim had a reasonable basis until it was dismissed. *Id.*

### B. Respondent's Response

Respondent argued that nothing in the Vaccine Act or Vaccine Rule 13 requires that he file a response to a request for an award of attorneys' fees and costs. Response at 1, ECF No. 66. However, he deferred to the Court regarding whether the statutory requirements for an award of attorneys' fee and costs were met. *Id.* at 2. Respondent further deferred to the discretion of the Court as to whether petitioner satisfied the good faith and reasonable basis requirements. *See generally* Response.

## IV.    Legal Standard

### A. Good Faith

"Good faith" is a subjective standard. *Hamrick v. Sec'y of Health & Human Servs.*, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). A petitioner acts in "good faith" if he or she holds an honest belief that a vaccine injury occurred. *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as petitioner had an honest belief that her claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Human Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

Since good faith was not raised by respondent, it will not be addressed, and petitioner is afforded the presumption of good faith in the filing of his petition.

### B. Reasonable Basis

Reasonable basis, however, is an objective inquiry, irrespective of counsel's conduct or a looming statute of limitations, that evaluates the sufficiency of records available at the time a claim is filed. *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017); *see Turpin v. Sec'y of Health & Human Servs.*, No. 99-564, 2005 WL 1026714 at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005). When determining if a reasonable basis exists, special masters and judges consider a myriad of factors. The factors to be considered may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018). The Federal Circuit concluded that "counsel may not use [an] impending statute of limitations deadline to establish a reasonable basis for [appellant's] claim." *Simmons*, 875 F.3d at 636. Further, an impending statute of limitations should not even be one of several factors the special master considers in her reasonable basis analysis. "[T]he Federal Circuit forbade, altogether, the consideration of statutory limitations deadlines—and all conduct of counsel—in determining whether there was a reasonable basis for a claim." *Amankwaa*, 138 Fed. Cl. at 289.

Reasonable basis is satisfied when there is a mere scintilla of objective evidence, such as medical records or medical opinions, supporting a feasible claim before filing. *See Cottingham ex. rel. K.C. v. Sec'y of Health & Human Servs.*, 971 F.3d 1337, 1346 (Fed. Cir. 2020); s*ee Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 286 (2014) (citing *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 303, 303 (2011)); *Silva v. Sec'y of Health & Human Servs.*, 108 Fed. Cl. 401, 405 (2012). A recent attempt to clarify what quantifies a scintilla looked to the Fourth Circuit, which characterized "more than a mere scintilla of evidence" as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham v. Sec'y of Health & Human Servs.,* 154 Fed. Cl. 790, 795 (2021) (quoting *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 765 (4th Cir. 2021)).

In discussing the reasonable basis requirement in *Cottingham*, the Federal Circuit stressed the prima facie petition requirements of § 11(c)(1) of the Act. Specifically, the petition must be accompanied by an affidavit and supporting documentation showing that the vaccinee:

(1) received a vaccine listed on the Vaccine Injury Table;
(2) received the vaccination in the United States, or under certain stated circumstances outside of the United States;
(3) sustained (or had significantly aggravated) an injury set forth in the Vaccine Injury Table (42 C.F.R. § 100.3(e)) or that was caused by the vaccine;
(4) experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and
(5) has not previously collected an award or settlement of a civil action for damages for the same injury.

*Cottingham*, 971 F.3d at 1345-46.

Special masters cannot award compensation "based on the claims of petitioner alone, unsubstantiated by medical records or by medical opinion." § 300aa-13(a)(1). However, absence of an express medical opinion of causation is not necessarily dispositive of whether a claim has a reasonable basis. Medical records may support causation even where the records provide only circumstantial evidence of causation. *James-Cornelius*, 984 F.3d at 1379-80. While absent or incomplete records do not strictly prohibit a finding of reasonable basis, an overwhelming lack of objective evidence will not support reasonable basis. *Chuisano*, 116 Fed. Cl. at 288; *see Simmons*, 875 F.3d at 634-36 (holding that reasonable basis was not satisfied where 1) petitioner's medical record lacked proof of vaccination and diagnosis and 2) petitioner disappeared for two years before filing a claim). The objective evidence in the record must also not be so contrary that a feasible claim is not possible. *Cottingham*, 154 Fed. Cl. at 795, citing *Randall v. Sec'y of Health & Human Servs.,* No. 18-448V, 2020 WL 7491210, at *12 (Fed. Cl. Spec. Mstr. Nov. 24, 2020) (finding no reasonable basis when petitioner alleged a SIRVA injury in his left arm though the medical records indicated that the vaccine was administered in petitioner's right arm). A claim may lose reasonable basis as it progresses if further evidence is unsupportive of petitioner's claim. *See R.K. v. Sec'y of Health & Human Servs.,* 760 F. App'x 1010, 1012 (Fed. Cir. 2019) (citing *Perreira v. Sec'y of Health & Human Servs.,* 33 F.3d 1375, 1376–77 (Fed. Cir. 1994)).

## V.   Discussion

### A.  Reasonable Basis

To establish a reasonable basis for attorneys' fees, the burden is lower than the preponderant evidence standard required to prove entitlement to compensation. *Cottingham*, 971 F.3d at 1345-46. Petitioner must provide more than a mere scintilla of evidence, defined as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham*, 154 Fed. Cl. at 795 (quoting *Sedar*, 988 F.3d at 765). It is well-established that an expert report addressing causation is not necessary to show that a claim had a reasonable basis. *James-Cornelius*, 984 F.3d at 1379-80. Further, the Federal Circuit explained in *James-Cornelius* that affidavits or sworn statements may provide objective evidence supporting a claim in the Vaccine Program. *Id*. at 1380-81.

Respondent did not present any specific arguments regarding reasonable basis. *See* Response. Based on the contemporaneous medical records and the affidavits filed, I find that petitioner provided sufficient evidence to support his claim for purposes of satisfying the reasonable basis requirements.

The petition alleges that, within one day of receiving the Pentacel and Prevnar vaccines, A.W. demonstrated an adverse reaction which included but was not limited to "small ticks, leg swelling, hives behind the knees, swollen face, fever, and breathing problems." Petition at 1-2. No contemporaneous medical record contains a report of any of these symptoms. However, A.W. was presented to the ER the day of her vaccinations with fever and a report of abnormal breathing by her mother. The record documented a "possible allergic reaction." Pet. Ex. 24 at 414-16; Pet. Ex. 28 at 3.

A month later, on July 21, 2017, A.W was presented to the pediatrician with a report of abnormal arm movements, shallow breathing, and "vaccine reaction". Pet. Ex. 3 at 13. The record contains diagnoses of abnormal involuntary movements and serum reaction due to vaccination. A.W. was referred to a neurologist and advised to refrain from immunizations until the neurology evaluation was completed. *Id*.

When Dr. Klein evaluated A.W. on September 1, 2017, she wrote that it was "difficult to say whether the events the parents are describing are related to vaccines." Pet. Ex. 8 at 15-16. She added that she was "in favor of continuing immunization, so, although it is reasonable to wait until a few things are clarified I would strongly recommend that she continue to get these." *Id*. Dr. Klein recommended additional testing for twitching but was unsure why A.W. was breathing shallowly or if it was related to the parents' other concerns. *Id*.

In the months and years that followed, A.W. was subjected to a myriad of testing, seen by multiple neurologists, a pediatric sleep specialist, an orthopedist, a cardiologist, a physiatrist, a geneticist, a genetic counselor, and received physical and occupational therapists. The diagnosis was hypotonia and benign sleep myoclonus. Pet. Ex. 7 at 672; Pet. Ex. 8 at 25-27, 166; Pet. Ex. 9 at 392. In May 2020, Dr. Klein wrote that she had been following A.W. since 2017 but "[n]o unitary diagnosis has emerged as of yet." Pet. Ex. 4 at 2.

The medical records are replete with references to parental reports of a reaction to A.W.'s four-month vaccines after the fact. Pet. Ex. 3 at 13; Pet. Ex. 8 at 98; Pet. Ex. 9 at 201, 363; Pet. Ex. 12 at 992, 994. A.W.'s treating physicians declined to connect any of the issues the parents complained of as vaccine related. However, when asked by the parents to do so, Dr. Klein wrote on one occasion that it was "difficult to say" whether the events were related, and on another occasion that she had "no opinion about the relationship of these issues to vaccine injury." Pet. Ex. 8 at 15-16; Pet. Ex. 11 at 672. Dr. Gold advised that "[g]iven her normal development trajectory over the past 18 months, hard to implicate vaccines as causative for her early motor delay." Pet. Ex. 20 at 4.

Petitioners' affidavits affirmed that A.W. had none of the alleged symptoms prior to the June 9, 2017 vaccinations and that Dr. Moore informed them on July 2017 that "she believed A.W.'s medical problems were due to the vaccines she received on June 9, 2017." Pet. Ex. 1. In a second affidavit on July 17, 2023, petitioner included that A.W. experienced a wide variety of health problems following the June 9, 2017 vaccines, and was "diagnosed with having experienced a 'vaccine reaction'." Pet. Ex. 34 at 1. He further affirmed that he was "informed by one of A.W.'s treating physicians that she believed A.W.'s medical problems were due to the vaccines she received", though the treaters declined to provide a written medical opinion when asked. *Id*. at 1-2.

Significant issues existed in this case, including that many of the same complaints raised by the parents were documented in the medical records since birth, no diagnosis was ever made for the complaints raised by the parents during A.W.'s infancy, her hypotonia was not attributed to her vaccinations and an expert could not support the claim. However, reasonable basis is an objective inquiry that evaluates the sufficiency of records available at the time a claim is filed, irrespective of counsel's conduct or a looming statute of limitations. *Simmons*, 875 F.3d at 636. The petitioner herein attempted to provide supporting opinion letters, first from A.W.'s treating physicians and then from a retained expert but was unable to do so. He then dismissed his case. It is certainly recognized, as documented in petitioner's counsel email to the Court[14], that there are times when a petitioner refuses to dismiss his case, even when presented with the facts and despite counsel's responsibility to advise their clients of the ramifications of not doing so.

Summarily, the notations of "vaccine reaction" throughout the contemporaneous medical records, supported by petitioner's affidavits, provide what the Federal Circuit determined to be more than a mere scintilla of evidence for establishing a reasonable basis. While the evidence filed would not have been sufficient for a finding of entitlement in favor of petitioner, a finding of reasonable basis has a burden much lower than the preponderance of the evidence standard. Petitioner pursued his claim until the time when it became clear that he could not obtain any supporting opinions of a vaccine-related injury, at which point he dismissed his case.

Finally, special masters have underscored the importance of awarding attorneys' fees to encourage the participation of competent legal counsel in the Vaccine Program. As the Special Master stated in *Iannuzzi v. Sec'y of Health & Human Servs*.:

---

[14] This email was filed as Court Exhibit 1. ECF No. 60.

> Simply put, the ultimate purpose of Vaccine Act fees and costs awards is *not* to benefit the *attorneys* involved, but to *ensure that Vaccine Act petitioners will have adequate access to competent counsel*. . . Accordingly, when attorneys spend a reasonable amount of time and costs in representing Vaccine Act petitioners, such attorneys must be fairly compensated for their expenditures, in order to encourage attorneys to participate in future Vaccine Act cases.

No. 02-780V, 2007 WL 1032379, at \*11 (Fed. Cl. Spec. Mstr. Mar. 20, 2007), *rev'd in part*, 78 Fed. Cl. 1 (2007) (emphasis in original); *see also James-Cornelius*, 984 F.3d at 1381 (in exercising her discretion to award attorneys' fees, the special master must keep in mind the remedial objective of maintaining petitioners' access to willing and qualified legal assistance).

## VI.    Attorneys' Fees and Costs Calculation

### A. Reasonable Hourly Rate

A "reasonable hourly rate" is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of petitioner's attorney." *Rodriguez v. Sec'y of Health & Human Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349). There is a "limited exception" that provides for attorney's fees to be awarded at local hourly rates when "the bulk of the attorney's work is done outside the forum jurisdiction" and "there is a very significant difference" between the local hourly rate and forum hourly rate. *Id.* This is known as the *Davis County* exception. *See Hall v. Sec'y of Health & Human Servs.*, 640 F.3d 1351, 1353 (2011) (citing *Davis Cty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. EPA*, 169 F.3d 755, 758 (D.C. Cir. 1999)).

For cases in which forum rates apply, *McCulloch* provides the framework for determining the appropriate hourly rate range for attorneys' fees based upon the attorneys' experience. *See McCulloch v. Sec'y of Health & Human Servs.*, No. 09–293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[15]

Petitioner requests an hourly rate of $350.00 for his counsel, Mr. Braden Blumenstiel, for all work performed in this case from 2020 through 2023. Motion for Fees, Ex. 1. These rates require a reduction. Mr. Blumenstiel has previously been awarded a rate of $225.00 per hour for all work performed in 2020, 2021, and 2022, and a rate of $275.00 per hour for all work performed in 2023. *See Kindberg v. Sec'y of Health & Human Servs.*, No. 21-1940V, 2025 WL 1011675 (Fed. Cl. Spec. Mstr. Jan. 22, 2025); *Duncan v. Sec'y of Health & Human Servs.*, No. 16-1367V, 2022

---

[15] The OSM Attorneys' Forum Hourly Rate Fee Schedules are available on the U.S. Court of Federal Claims website at https://www.uscfc.uscourts.gov/osm-attorneys-forum-hourly-rate-fee-schedules.The hourly rates contained within the schedules are updated from the decision in *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015).

WL 4494273 (Fed. Cl. Spec. Mstr. Sept. 7, 2022). Therefore, I will apply the previously awarded rates, resulting in a reduction of **$6,335.00**.[16]

Petitioner also requested $120.00 per hour for all paralegal work performed in this matter. Motion for Fees, Ex. 1. This rate is within the Vaccine Program's published range,[17] and I thus find it to be reasonable.

## B.  Hours Reasonably Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). "Unreasonably duplicative or excessive billing" includes "an attorney billing for a single task on multiple occasions, multiple attorneys billing for a single task, attorneys billing excessively for intra office communications, attorneys billing excessive hours, [and] attorneys entering erroneous billing entries." *Raymo v. Sec'y of Health & Human Servs.*, 129 Fed. Cl. 691, 703 (2016). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *See O'Neill v. Sec'y of Health & Human Servs.*, No. 08–243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *See, e.g.*, *McCulloch*, 2015 WL 5634323, at *26. Hours spent traveling are ordinarily compensated at one-half of the normal hourly attorney rate. *See Scott v. Sec'y of Health & Human Servs.*, No. 08–756V, 2014 WL 2885684, at *3 (Fed. Cl. Spec. Mstr. June 5, 2014) (collecting cases). And "it is inappropriate for counsel to bill time for educating themselves about basic aspects of the Vaccine Program." *Matthews v. Sec'y of Health & Human Servs.*, No 14–1111V, 2016 WL 2853910, at *2 (Fed. Cl. Spec. Mstr. Apr. 18, 2016). Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton*, 3 F.3d at 1522. In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen*, 102 Fed. Cl. at 728–29 (affirming the Special Master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 403, 406 (1997) (same).

A detailed review of the billing records revealed numerous issues. First, both Mr. Blumenstiel and his paralegals routinely block billed tasks, to the point that the majority of the entries in the billing record contain block billing that makes it impossible to determine how much time was spent on each task. *See* Motion for Fees, Ex. 2 at 1-18. Block billing is disfavored by the Program, as it frustrates the Court's ability to evaluate the reasonableness of the time billed. *See Riggins v. Sec'y of Health & Human Servs.*, No. 99-382V, 2009 WL 3319818, at *23-24 (Fed. Cl. Spec. Mstr. June 15, 2009). Further, there are various entries that are inadequately described, such as 5.50 hours on June 28, 2023 that has no description of the work performed. Special masters have previously decreased an award of attorneys' fees for vagueness. *Mostovoy v. Sec'y of Health*

---

[16] (7.8 hours in 2020 x ($350 - $225) = $975.00) + (1.7 hours in 2021 x ($350 - $225) = $212.50) + (4.4 hours in 2022 x ($350 - $225) = $550.00) + (61.3 hours in 2023 x ($350 - $275) = $4,597.50) = $6,335.00.

[17] *Id.*

*Human Servs.*, No. 02-10V, 2016 WL 720969 (Fed. Cl. Spec. Mstr. Feb.4, 2016); *Barry v. Sec'y of Health and Human Servs.*, 12-39V, 2016 WL 6835542 (Fed. Cl. Spec. Mstr. Oct. 25, 2016) (reduced a fee award by 10 percent due to vague billing entries). An application for fees and costs must sufficiently detail and explain the time billed so that a special master may determine, from the application and the case file, whether the amount requested is reasonable. *Bell v. Sec'y of Health & Human Servs.*, 18 Cl.Ct. 751, 760 (1989). Petitioners bear the burden of documenting the fees and costs claimed. *Rodriguez v. Sec'y of Health & Human Servs.*, No. 06-559V, 2009 WL 2568468, at *8 (Fed. Cl. Spec. Mast. July 27, 2009).

Second, much of the work that was billed in the first few years of this case was paralegal time, and the paralegal billed the same rate for all work, regardless of whether it was paralegal, secretarial or clerical work. Motion for Fees, Ex. 2 at 1-18. For example, an entry on August 20, 2020 billed for "[t]rying to pay an invoice". *Id.* at 4. It is clearly established that secretarial work "should be considered as normal overhead office costs included within the attorneys' fee rates." *Rochester v. U.S.*, 18 Cl. Ct. 379, 387 (1989); *Dingle v. Sec'y of Health & Hum. Servs.*, No. 08-579V, 2014 WL 630473, at *4 (Fed. Cl. Spec. Mstr. Jan. 24, 2014). "[B]illing for clerical and other secretarial work is not permitted in the Vaccine Program." *Mostovoy v. Sec'y of Health Hum. Servs.*, No. 02-10V, 2016 WL 720969, at *5 (Fed. Cl. Spec. Mstr. Feb. 4, 2016) (citing *Rochester*, 18 Cl. Ct. at 387).

Additionally, Mr. Blumenstiel at times billed his full attorney rate for paralegal and/or clerical work, such as filing the petition and exhibits, Bates stamping and filing medical records, and updating the calendar. Motion for Fees, Ex. 2 at 3, 7, 13. "Tasks that can be completed by a paralegal or a legal assistant should not be billed at an attorney's rate." *Riggins v. Sec'y of Health & Human Servs.*, No. 99-382V, 2009 WL 3319818, at *21 (Fed. Cl. Spec. Mstr. June 15, 2009). "[T]he rate at which such work is compensated turns not on who ultimately performed the task but instead turns on the nature of the task performed." *Doe/11 v. Sec'y of Health & Human Servs.*, No. XX-XXXXV, 2010 WL 529425, at *9 (Fed. Cl. Spec. Mstr. Jan. 29, 2010).

Finally, as thoroughly outlined in the procedural history herein, petitioner's counsel routinely failed to comply with court-ordered deadlines throughout the course of this matter. *See* Non-PDF Scheduling Order, issued July 6, 2020 (sua sponte extending petitioner's first deadline after it was missed by nearly two weeks); ECF No. 11 (motion for extension of time filed one week after the deadline); ECF No. 26 (motion for extension of time filed three days after the deadline); ECF No. 27 (scheduling order issued due to a missed deadline); ECF No. 28 (motion for extension of time filed the day after the deadline); ECF No. 42 (scheduling order issued due to a missed deadline); ECF No. 43 (order to show cause issued due to missed deadlines); ECF No. 61 (motion to dismiss filed 11 days after the deadline). This is particularly irksome because this is not the first time Mr. Blumenstiel has shown a conscious and habitual disregard for deadlines and court orders. *See Hoffman Est. of Christner v. Sec'y of Health & Human Servs.*, No. 16-1122V, 2023 WL 3092668 (Fed. Cl. Spec. Mstr. Mar. 29, 2023); *Duncan v. Sec'y of Health & Human Servs.*, No. 16-1367V, 2020 WL 6738118 (Fed. Cl. Spec. Mstr. Oct. 19, 2020), mot. for review denied, *Duncan v. Sec'y of Health & Human Servs.*, No. 16-1367V, 2021 WL 1748217 (Fed. Cl. Apr. 19, 2021) (noting Mr. Blumenstiel's missed deadlines and many motions for extension of time); *Dia v. Sec'y of Health & Human Servs.*, No. 14-954, 2017 WL 2644695, at *1 (Fed. Cl. Spec. Mstr.

May 25, 2017) (noting Mr. Blumenstiel missed "various deadlines without filing an appropriate motion for enlargement of time").

In evaluating a motion for attorney's fees and costs, special masters "need not, and indeed should not, become green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011). Because counsel has been repetitively admonished by the Court for his disregard for orders and deadlines set by various special masters, including the undersigned, in prior cases and because he has shown no effort to avoid such conduct, the undersigned shall exercise her discretion in setting reasonable fees to be awarded and reduce the request for attorney fees by twenty-five percent. This results in a reduction of $9,247.65.[18]

Petitioner is therefore awarded final attorneys' fees of **$27,742.96.**[19]

### C. Reasonable Costs

Like attorneys' fees, a request for reimbursement of attorneys' costs must be reasonable. *Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (Fed. Cl. 1992). Petitioner requests a total of $3,029.41 in costs. Motion for Fees, Ex. 2.

The costs requested by petitioner include a $2,600.00 payment to Consolidated Consultants Co., an expert witness referral service on July 20, 2023. Motion for Fees, Ex. 2 at 25-26. Petitioner's counsel's billing records indicate that this $2,600.00 fee was for "Dr. Axelson expert retainer fee paid by clients." *Id.* at 17. However, petitioner's counsel failed to file a statement regarding General Order No. 9 delineating the costs borne by petitioner. The remainder of the costs requested by petitioner consist of costs for acquiring medical records. Motion for Fees, Ex. 2 at 19-28. I find the requested costs reasonable and supported with adequate documentation and therefore award them accordingly.

Petitioner is therefore awarded total costs of **$3,029.41.**

### VII.    Conclusion

Based on the foregoing, petitioner's Motion for Attorneys' Fees and Costs is **GRANTED, in part.** Petitioner is hereby awarded a total of **$30,772.37,** representing $27,742.96 in attorneys' fees and $3,029.41 in costs ($2,600.00 of which is to be paid to petitioner for his personally incurred costs), to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.

The Clerk of Court is directed to enter judgment in accordance with this decision.[20]

---

[18] Total requested attorneys' fees ($43,325.61) – Reduction made for incorrect rates ($6,335.00) = $36,990.61 x 25% = $9,247.65.

[19] Total attorneys' fees after rate reduction ($36,990.61) – 25% reduction ($9,247.65) = $27,742.96.

[20] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/ Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master